[No. 79025-6. En Banc.]
Argued March 20, 2007.    Decided August 16, 2007.

*In the Matter of the Personal Restraint of* DONALD T. McCARTHY, *Respondent.*

---

[13] A similarly curative amendment to RCW 49.46.010 was passed in 2002. *See* LAWS OF 2002, ch. 354, § 231.

*Robert M. McKenna, Attorney General, Jay D. Geck, Deputy Solicitor General,* and *Gregory J. Rosen, Assistant*; and *Arthur D. Curtis, Prosecuting Attorney for Clark County,* and *Michael C. Kinnie, Deputy,* for petitioner.

*Richard A. Linn* (of *Law Office of Richard Linn, PLLC*), for respondent.

¶1 OWENS, J. — Donald McCarthy is serving an indeterminate sentence as a nonpersistent sex offender under RCW 9.94A.712. Prior to the expiration of his minimum term, the Indeterminate Sentence Review Board (Board) conducted a hearing under RCW 9.95.420(3) (.420 hearing)

and found that he would likely reoffend if released. McCarthy contends that due process requires legal counsel for offenders during the .420 hearing. The Court of Appeals held that the Board must exercise its discretion on a case-by-case basis to decide whether legal counsel is necessary. We reverse and hold that the limited liberty interests implicated in .420 hearings entitle offenders to minimum procedural protections that do not include the right to counsel.

## FACTS

¶2 In May 2002, McCarthy approached an adult female with Down's Syndrome in a mall bookstore. Witnesses reported that he pressed and massaged his genital area against the woman's buttocks with one leg raised in a bent position. He stipulated to an exceptional sentence and pleaded guilty to the reduced charge of third degree assault with sexual motivation. The trial court sentenced McCarthy to an exceptional minimum sentence of 12 months and one day and a maximum term of 60 months.[1]

¶3 In August 2003, the Board held McCarthy's first .420 hearing to determine whether he was eligible for release. When McCarthy requested an attorney, the Board responded that "[w]e don't have attorneys at this particular hearing because the Department of Corrections has decided there would not be attorneys, and in order to avoid economic discrimination we don't allow attorneys at these hearings." Pers. Restraint Pet., Ex. 4, at 1 (Unofficial Tr.). During the hearing, McCarthy's prison counselor testified that McCarthy had paranoid schizophrenia and was "extremely fearful, anxious and paranoid." *Id.* at 4. He also indicated that McCarthy regularly took medications for these conditions. *Id.* at 5. McCarthy told the Board, "I'm

---

[1] Although third degree assault with sexual motivation is generally not subject to indeterminate sentencing, McCarthy qualified for sentencing under RCW 9.94A.712(1)(b) because his prior Oregon conviction for first degree sex abuse is equivalent to the predicate offense of first degree child molestation.

kinda slow so bear with me." *Id.* at 2. The hearing transcript indicates that he answered the Board's questions and explained his relationships with family members and his progress through treatment while incarcerated. *See id.* at 9-12, 15-18.

¶4 Despite his contention that family support and treatment would help him control himself if released, the Board found by a preponderance of the evidence that McCarthy was more likely than not to commit another sex offense if released and added 24 months to McCarthy's minimum term. The Board recommended that McCarthy complete the sex offender treatment program during his extended minimum sentence. The Board concluded that "unless he has some sex offender treatment in order to learn about his deviant desires and behaviors[,] he would constitute an ongoing danger to the community, especially young, vulnerable, or mentally disabled people." Pers. Restraint Pet., Ex. 3, at 3 (Decision and Reasons, Sept. 16, 2003).

¶5 In September 2004, the Board held another .420 hearing for McCarthy. The Board again denied his request for an attorney. The Board recognized that McCarthy was making satisfactory progress in the sex offender treatment program but nonetheless found that he was more likely than not to commit a sex offense if released. It thus extended his minimum sentence by 23 months and 26 days.

¶6 McCarthy subsequently filed a personal restraint petition alleging, in part, that the Board abused its discretion by failing to appoint counsel for his .420 hearing. The Court of Appeals held that due process requires the Board to decide on a case-by-case basis whether offenders are entitled to counsel during .420 hearings to ensure fundamental fairness. The court remanded for the Board "to consider his request for legal representation." *In re Pers. Restraint of McCarthy*, 134 Wn. App. 752, 754, 143 P.3d 599 (2006). We granted the Board's motion for discretionary review.

## ISSUE

¶7 Do offenders have a right to counsel during .420 hearings?

## ANALYSIS

A. *Standard of Review*

█ ¶8 We review constitutional questions de novo. *Amunrud v. Bd. of Appeals*, 158 Wn.2d 208, 215, 143 P.3d 571 (2006), *cert. denied*, 127 S. Ct. 1844 (2007).

B. *Nonpersistent Offender Sentencing*

¶9 RCW 9.94A.712, which governs the sentencing of certain nonpersistent sex offenders, mandates that offenders receive an indeterminate sentence comprised of a minimum and maximum term. RCW 9.94A.712(3)(a). Before the expiration of an offender's minimum term, the Department of Corrections conducts an end of sentence review by evaluating the offender based on "methodologies . . . recognized by experts in the prediction of sexual dangerousness." RCW 9.95.420(1)(a). The Board then conducts a hearing to determine whether the offender poses a risk of engaging in sex offenses if released to community custody. RCW 9.95.420(3).[2] Under RCW 9.95.420(3)(a) and (b), the Board "*shall* order the offender released" under appropriate conditions "*unless* the [B]oard determines by a preponderance of the evidence that, despite such conditions, it is more

---

[2] The dissent confuses the procedures under RCW 9.95.420(1) with RCW 9.95.420(3). *See* dissent at 246. Subsection (1)(a) requires the *department* to conduct an *end of sentence review* of the offender "incorporating methodologies that are recognized by experts in the prediction of sexual dangerousness." Subsection (3)(a)—the provision at issue here—requires the *Board* to conduct a *hearing* "to determine whether it is more likely than not that the offender will engage in sex offenses if released." We are not considering the question of whether due process requires attorneys during the *end of sentence review*, which may involve medical terminology. Although the statute directs that the Board "shall consider the department's recommendations" in making its release decision, RCW 9.95.420(2), the hearing under subsection (3) is a separate proceeding requiring the Board to make an informed prediction.

likely than not that the offender will commit sex offenses if released." (Emphasis added.) If the Board does not order the offender released, it must establish a new minimum term for the offender, which may not exceed two years and must fall within the maximum term. *Id.*

¶10 According to the Board, offenders are entitled to the following procedural protections during .420 hearings: (1) an opportunity to be heard and to present information to the Board, (2) the right to question other persons providing information to the Board, (3) a neutral and detached hearing body, and (4) a written statement by the Board explaining the reasons upon which it decided to either release the offender to community custody or extend the offender's minimum term. Suppl. Br. of Board at 15. The Board decision is recorded and subject to judicial oversight through a personal restraint petition. *Id.* McCarthy contends that due process also requires that offenders have the right to counsel.

## C. *Procedural Due Process*

¶11 An individual seeking the procedural protection of the Fourteenth Amendment's due process clause must establish that his or her interest in life, liberty, or property is at stake. *Wilkinson v. Austin*, 545 U.S. 209, 221, 125 S. Ct. 2384, 162 L. Ed. 2d 174 (2005). "A liberty interest may arise from the Constitution," from "guarantees implicit in the word 'liberty,'" or "from an expectation or interest created by state laws or policies." *Id.* Where an individual establishes a liberty interest, some minimal due process protections apply. *See Morrissey v. Brewer*, 408 U.S. 471, 481-82, 92 S. Ct. 2593, 33 L. Ed. 2d 484 (1972).

¶12 Thus, as a threshold issue, we must first determine whether McCarthy has a liberty interest at stake during a .420 hearing. Inmates generally do not have a liberty interest in release prior to the expiration of a valid sentence. *State v. Clarke*, 156 Wn.2d 880, 890, 134 P.3d 188 (2006). However, the Supreme Court has recognized that state statutes may create liberty interests where none

otherwise exist.[3] *Greenholtz v. Inmates of Neb. Penal & Corr. Complex*, 442 U.S. 1, 12, 99 S. Ct. 2100, 60 L. Ed. 2d 668 (1979). In *Greenholtz*, the Court held that the unique structure and language of a Nebraska parole statute, which mandated that the Board of Parole *shall* order an inmate's release *unless* it found one of four designated reasons for deferring parole, created a legitimate expectation of release. *Id.* at 11-12. According to the Court, the mandatory language established a presumption that offenders would be released on parole and thus created a limited liberty interest. *See id.* at 12.

¶13 In the instant case, RCW 9.95.420(3) creates a presumption in favor of release. Like the Nebraska statute in *Greenholtz*, RCW 9.95.420(3) requires the Board to release the offender unless it finds the offender likely to commit sex offenses upon release. Pursuant to *Greenholtz*, RCW 9.95.420(3) creates a limited liberty interest by restricting the Board's discretion and establishing a presumption that offenders will be released to community custody upon the expiration of their minimum sentence.[4]

¶14 Having concluded that offenders have a limited liberty interest under RCW 9.95.420(3), we must next determine what process is due. When a statute creates an expectancy of release, offenders are entitled to some measure of constitutional protection. *See Greenholtz*, 442 U.S. at 12. "[T]he quantum and quality of the process due in a particular situation depend upon the need to serve the purpose of minimizing the risk of error." *Id.* at 13 (citing

---

[3] We have similarly recognized that "[b]y enacting a law that places substantive limits on official decisionmaking, the State can create an expectation that the law will be followed, and this expectation can rise to the level of a protected liberty interest." *In re Pers. Restraint of Cashaw*, 123 Wn.2d 138, 144, 866 P.2d 8 (1994) (finding no liberty interest in parole release decisions under RCW 9.95.100 because of the discretionary nature of the decision and the statute's presumption of continued incarceration).

[4] We reject McCarthy's contention that the mandatory language of the statute renders the liberty interest analogous to that at stake in parole revocation decisions. As the Supreme Court recognized in *Greenholtz*, "[P]arole *release* and parole *revocation* are quite different. There is a crucial distinction between being deprived of a liberty one has, as in parole, and being denied a conditional liberty that one desires." 442 U.S. at 9.

*Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976)). In determining the appropriate level of protection in the parole context, the Supreme Court has applied the *Mathews* balancing test, which examines the private interest, the risk of an erroneous deprivation, the probable value of additional procedural safeguards, and the government's interest, including the function involved and the additional fiscal and administrative burdens. 424 U.S. at 334-35.

¶15 With respect to parole *release* statutes that create limited liberty interests, the Supreme Court has held that due process does not require formal, adversarial hearings. *Greenholtz*, 442 U.S. at 15-16. In *Greenholtz*, the Court reasoned that such hearings "would provide at best a negligible decrease in the risk of error" because the parole release decision primarily involves an examination of the inmate's files regarding the gravity of his offense and prison behavior record. *Id.* at 14-15. The Court concluded that the Board's review of the inmate's file, together with the inmate's opportunities to appear before the Board, "adequately safeguards against serious risks of error and thus satisfies due process."[5] *Id.* at 15. "Merely because a statutory expectation exists cannot mean that in addition to the full panoply of due process required to convict and confine there must also be repeated, adversary hearings in order to continue the confinement." *Id.* at 14. The Court evaluated the process due in parole release hearings and concluded that "[t]he Constitution does not require more" than the "opportunity to be heard" and an explanation when the Board denies parole. *Id.* at 16.

¶16 In the instant case, the Court of Appeals relied on Supreme Court precedent relating to parole *revocation* proceedings to support its holding that due process requires

---

[5] The Nebraska statute allowed offenders to have private counsel at the offender's expense during the final parole release hearing. *Greenholtz*, 442 U.S. at 5. Here, the Board specifically prohibits private counsel in .420 hearings. The parties have not challenged the Board's restriction on private counsel, and we therefore do not address the issue.

the Board to evaluate on a case-by-case basis whether counsel is necessary for offenders during .420 hearings. *See McCarthy*, 134 Wn. App. at 759-60 (quoting *Gagnon v. Scarpelli*, 411 U.S. 778, 790, 93 S. Ct. 1756, 36 L. Ed. 2d 656 (1973)). In *Scarpelli*, the Court adopted a case-by-case approach for determining whether counsel is necessary for parole *revocation* hearings:

> [T]he decision as to the need for counsel must be made on a case-by-case basis in the exercise of a sound discretion by the state authority charged with responsibility for administering the probation and parole system. Although the presence and participation of counsel will probably be both undesirable and constitutionally unnecessary in most revocation hearings, there will remain certain cases in which fundamental fairness—the touchstone of due process—will require that the State provide at its expense counsel for indigent probationers or parolees.

411 U.S. at 790. The Court in *Scarpelli* adopted this approach in part because of the more significant liberty interest at stake when an inmate already released on parole faces *revocation* of that parole status. The more significant liberty interest arises because parolees live a relatively normal life after release from prison and rely on the implicit promise that the State will revoke parole only if they fail to abide by the parole conditions. *Morrissey*, 408 U.S. at 482, 480 (recognizing that "[r]evocation deprives an individual, not of the absolute liberty to which every citizen is entitled, but only of the conditional liberty properly dependent on observance of special parole restrictions"). The Court also deemed the case-by-case approach appropriate because of the factual nature of the inquiry when a parole board determines whether a parolee violated conditions of parole. *Scarpelli*, 411 U.S. at 787 (explaining that "the unskilled or uneducated probationer or parolee may well have difficulty in presenting his version of a disputed set of facts").

¶17 The .420 hearings are more analogous to parole *release* than to parole *revocation*. The liberty interest at

stake for an offender facing revocation of parole is more significant because the offender has already been released from incarceration. Offenders in .420 hearings face continued incarceration. Further, the nature of the Board's inquiry during .420 hearings is more predictive and discretionary than the inquiry in parole revocation hearings. In determining whether an offender is likely to commit sex offenses if released under RCW 9.95.420(3), the Board hears testimony from the offender's treatment counselors about the offender's performance and behavior in the institution. The offender may testify on his or her own behalf and present support letters and plans for reintegration into society. The Board then makes an informed prediction about whether it believes the offender is likely to commit more sex offenses if released before the expiration of his or her maximum sentence.

¶18 Given the distinction between the liberty interests and the nature of the inquiry involved in parole *revocation* and parole *release* proceedings, the Court of Appeals erred when it adopted the case-by-case approach applicable to parole revocation proceedings for .420 hearings. Neither the Supreme Court nor this court has established that due process requires legal representation for offenders facing parole *release* decisions such as .420 hearings, even on a case-by-case basis. *See Greenholtz*, 442 U.S. at 15-16. We have likewise rejected the argument that due process requires legal representation for offenders during other Board proceedings. *See In re Pers. Restraint of Whitesel*, 111 Wn.2d 621, 631, 763 P.2d 199 (1988) (holding that inmates do not have the right to an attorney during the Board's minimum term redetermination); *Arment v. Henry*, 98 Wn.2d 775, 778-80, 658 P.2d 663 (1983) (declining to adopt a per se rule mandating the right to counsel at Board disciplinary hearings that could increase the offender's minimum term); *In re Pers. Restraint of Sinka*, 92 Wn.2d 555, 564-65, 599 P.2d 1275 (1979) (holding that offenders are entitled to minimum due process protections when the Board establishes their minimum terms).

¶19 The unique statutory language and structure of RCW 9.95.420 give offenders only a limited liberty interest in .420 hearings—an interest more limited than the interest at stake during parole revocation decisions. To protect offenders' limited liberty interest in .420 hearings, due process requires that offenders have minimum procedural protections. Under *Greenholtz*, these protections do not include the right to counsel. Thus, we reverse the Court of Appeals' holding that the Board must exercise its discretion to determine on a case-by-case basis whether offenders are entitled to counsel during .420 hearings.[6]

## CONCLUSION

¶20 We hold that .420 hearings involve limited liberty interests and pursuant to *Greenholtz*, offenders are entitled to minimum due process protections that do not include the right to counsel. Accordingly, we reverse the Court of Appeals' decision remanding to the Board to determine whether McCarthy is entitled to legal counsel.

MADSEN, BRIDGE, FAIRHURST, and J.M. JOHNSON, JJ., concur.

¶21 ALEXANDER, C.J. (dissenting) — I agree with the majority that offenders have a limited liberty interest at stake in a hearing under RCW 9.95.420 (.420 hearing). Like the statute considered by the United States Supreme Court in *Greenholtz v. Inmates of the Nebraska Penal & Correctional Complex*, 442 U.S. 1, 99 S. Ct. 2100, 60 L. Ed. 2d 668 (1979), RCW 9.95.420 creates a legitimate expectation that an offender will be released to community custody after completing his or her minimum sentence. It does so by providing that the Indeterminate Sentence Review Board (Board) *"shall order* the offender released" after a .420

---

[6] We note, however, that exceptional circumstances may arise where an offender's severe mental or physical disabilities or other extraordinary condition prevents the offender from engaging in meaningful discussion with the Board during the .420 hearing. In such cases, the Board must exercise its discretion to ensure the offender has the "opportunity to be heard" required under *Greenholtz*, 442 U.S. at 16. Those circumstances are not present in this case record.

hearing *unless* it determines that "it is more likely than not that the offender will commit sex offenses if released." RCW 9.95.420(3)(a) (emphasis added).

¶22 However, in determining the due process protections necessary in .420 hearings, the majority analogizes .420 hearings to parole release hearings. I disagree with this characterization. In my view, there is a greater risk of erroneous deprivation at a .420 hearing than at a parole release hearing. Because of this, greater due process protections should be required than were provided here. Thus, I respectfully dissent.

¶23 The parole-release determination at issue in *Greenholtz* was based primarily on inmates' records while incarcerated and " 'often involve[d] no more than informed predictions.' " *Greenholtz*, 442 U.S. at 10 (quoting *Meachum v. Fano*, 427 U.S. 215, 225, 96 S. Ct. 2532, 49 L. Ed. 2d 451 (1976)). The Court distinguished it from parole-*revocation* determinations, which involve a " 'wholly retrospective factual question' " in addition to a subjective determination "whether the parolee should be recommitted." *Id.* at 9 (quoting *Morrissey v. Brewer*, 408 U.S. 471, 479, 92 S. Ct. 2593, 33 L. Ed. 2d 484 (1972)). Although the determination in a .420 hearing is primarily predictive in nature, it additionally involves the evaluation of tests, expert opinions, and factual determinations such as whether an offender has participated in treatment.

¶24 Furthermore, unlike parole release hearings, which generally are conducted in language that is understandable to a layperson, .420 hearings will almost always involve complicated medical terminology and the translation of test results. *See* RCW 9.95.420(1)(a) (instructing the department to "conduct . . . an examination of the offender, incorporating methodologies that are recognized by experts in the prediction of sexual dangerousness," which is considered in the .420 hearing). Like the mental health determination reviewed by the United States Supreme Court in *Vitek v. Jones*, 445 U.S. 480, 100 S. Ct. 1254, 63 L. Ed. 2d 552 (1980), the determination of a sex offender's likelihood

to reoffend " 'turns on the meaning of the facts which must be interpreted by expert psychiatrists and psychologists.' " *Id.* at 495 (quoting *Addington v. Texas*, 441 U.S. 418, 429, 99 S. Ct. 1804, 60 L. Ed. 2d 323 (1979)). "It is precisely '[the] subtleties and nuances of psychiatric diagnoses' that justify the requirement of adversary hearings." *Id.* (alteration in original) (quoting *Addington*, 441 U.S. at 430). Inmates may need the assistance of counsel at those hearings to meaningfully challenge such complex interpretations.

¶25 The balancing test set forth in *Mathews v. Eldridge*, 424 U.S. 319, 334-35, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976), requires us to weigh the private interest to be affected, the risk of an erroneous deprivation of the interest, and the probable value of additional procedural safeguards against the government's interest and the burden of additional procedures. Because I conclude that the risk of erroneous deprivation is greater in .420 hearings than in parole release hearings, I would hold that greater due process protections are required under *Mathews*. Although I would decline, as this court did in *Arment v. Henry*, 98 Wn.2d 775, 778-80, 658 P.2d 663 (1983), to require counsel at *all* .420 hearings, the Board should determine on a case-by-case basis whether counsel is necessary in order to protect an inmate's due process right to a meaningful hearing.

¶26 The cases cited by the majority regarding "legal representation for offenders during other Board proceedings," majority at 0, are inapposite here. In *In re Personal Restraint of Whitesel*, 111 Wn.2d 621, 763 P.2d 199 (1988), we considered the unique sentence reviews conducted by the Board after the Sentencing Reform Act of 1981 (SRA), chapter 9.94A RCW, was passed. At the legislature's request, the Board reviewed minimum sentences set under the indeterminate sentencing scheme that existed prior to the SRA. We held in *Whitesel* that prisoners had no right to an attorney at those reviews. We recognized, however, that an indigent prisoner's need for appointed counsel in *parole and probation hearings* must be determined on a case-by-

case basis. *Whitesel*, 111 Wn.2d at 631 (citing *Gagnon v. Scarpelli*, 411 U.S. 778, 788-89, 93 S. Ct. 1756, 36 L. Ed. 2d 656 (1973)). We also recognized that rule in *Arment*, 98 Wn.2d at 778, while holding that there was no per se rule that prisoners were entitled to counsel at disciplinary hearings for *rule violations while in prison. See also Whitesel*, 111 Wn.2d at 631. In the third case the majority cites, we *did not decide* whether counsel was required for the setting of minimum terms. *In re Pers. Restraint of Sinka*, 92 Wn.2d 555, 599 P.2d 1275 (1979). *But see Whitesel*, 111 Wn.2d at 630-31 (stating that counsel would not be required when setting minimum terms). In holding that inmates must be advised of adverse information in the file considered by the Board, in addition to receiving the most basic of due process requirements, we "emphasize[d]" that "due process 'is flexible and calls for such procedural protections as the particular situation demands.'" *Sinka*, 92 Wn.2d at 565 (quoting *Morrissey*, 408 U.S. at 481).

¶27 The particular situation presented by this case offers a striking example of the unfair results of the Board's strict policy against providing inmates with attorneys. The record shows that Donald McCarthy was "slow," uneducated, and suffering from mental illness. Pers. Restraint Pet., Ex. 4, at 2 (McCarthy describing himself as "kinda slow"), 4 ("[h]istory of paranoid schizophrenia"), 6 (describing "McCarthy as a very fragile person"); Pers. Restraint Pet., Ex. 5 (IQ (intelligence quotient) of 72); Pers. Restraint Pet., Ex. 6 (McCarthy did not finish high school and has mental health needs). Nevertheless, he was denied an attorney at both of his .420 hearings, with the result that he lost any meaningful opportunity for early release and was ultimately required to serve nearly five times his original minimum sentence.

¶28 The United States Supreme Court has held that counsel should be provided to indigent prisoners who are illiterate, uneducated, or "thought to be suffering from a mental disease or defect requiring involuntary treatment" when the State seeks to confine them further, because those prisoners have a "greater need for legal assistance" to

"understand or exercise [their] rights." *Jones*, 445 U.S. at 496-97. This court recognized that reasoning in *Arment*, 98 Wn.2d at 778-79. As the United States Supreme Court noted, "[a]lthough the presence and participation of counsel will probably be both undesirable and constitutionally unnecessary in most . . . hearings, there will remain certain cases in which fundamental fairness—the touchstone of due process—will require that the State provide at its expense counsel for indigent probationers or parolees," or in this case, offenders during .420 hearings. *Scarpelli*, 411 U.S. at 790. The majority's rejection of case-by-case review of the need for an attorney would essentially prevent such a provision.

¶29 Here, I believe it is apparent that McCarthy should have been provided with counsel. That, however, is a determination for the Board to make and one that I conclude they should have made. Consequently, I would affirm the Court of Appeals and remand the case to the Board to determine whether McCarthy should be represented by counsel and, if so, to provide a new hearing.

C. JOHNSON, SANDERS, and CHAMBERS, JJ., concur with ALEXANDER, C.J.